**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: _____

Africa Growth Corporation,

    Plaintiff,

v.

Republic of Angola,

    Defendant.
_____/

## VERIFIED COMPLAINT

Plaintiff Africa Growth Corporation ("AFGC"), a publicly-traded, U.S. shareholder-owned Nevada corporation, sues defendant Republic of Angola ("Angola") and alleges as follows:

## NATURE OF THE ACTION

1. Angola has a long and unfortunate history of governmental corruption, fraud and other unlawful conduct that has caused foreign investors and businesses to undertake additional precautionary measures and enhanced due diligence before engaging and operating within its borders. Although Angola recently has sought to rebrand itself and has represented itself to be a more transparent and investor-friendly nation, its past remains its present. AFGC regrettably has learned this lesson by direct experience. Despite acting with the requisite care and due diligence and obtaining the advice of leading international law and accounting firms and auditors before investing in Angola, thereby having entered the Angolan business market with the best possible risk management, AFGC now constitutes one of Angola's latest foreign investor victims.

2. Specifically, in the interest of resolving a more than two-year old dispute relating to Angola's unlawful seizure and expropriation of assets and real property lawfully owned by AFGC and its Angolan subsidiaries (claims which are currently valued at approximately USD 95 million), AFGC entered into a settlement agreement with Angola in Lisbon, Portugal on February 12, 2019 ("Settlement Agreement"). The Settlement Agreement provided that Angola would make a lump-sum payment to AFGC of USD 47.5 million by wire transfer into the bank account of AFGC's Miami-based U.S. lawyers (Shutts & Bowen) on or before February 27, 2019.

3. During the negotiations leading up to and upon entering the Settlement Agreement, Angola repeatedly represented to AFGC that the agreed settlement had the personal approval and direct support of Angolan President Joao Lourenço ("President Lourenço") and that its representatives were fully empowered to enter into a final and binding settlement with AFGC on behalf of the Republic of Angola.

4. Angola has failed to make the agreed payment to AFGC's counsel in Florida and has thereby breached the Settlement Agreement.

5. In this action, AFGC seeks the immediate enforcement of the terms of the Settlement Agreement and such other and further relief as the Court may order.

## THE PARTIES

6. Plaintiff, AFGC, is a Nevada corporation with its registered office address in Las Vegas, Nevada. AFGC is a U.S. publicly-traded, OTC-listed company. The majority of AFGC's stock is owned by U.S. shareholders and the majority of members of its board of directors are U.S. citizens.

7. Defendant Angola is a "foreign state" within the meaning of 28 U.S.C. § 1603(a).

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this cause pursuant to 28 U.S.C. § 1330(a), which provides that "[t]he district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state" within the meaning of 28 U.S.C. § 1603(a). Accordingly, this Court has jurisdiction over Angola pursuant to 28 U.S.C. § 1330(a) and 28 U.S.C. § 1603(a).

9. Defendants are not immune from the jurisdiction of this Court in this case under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1604, for the following reasons:

   a. Pursuant to 28 U.S.C. § 1605(a)(1), Angola has waived its immunity explicitly, or alternatively, by implication; and

   b. Pursuant to 28 U.S.C. § 1605(a)(2), Angola has performed acts outside the territory of the United States in connection with a commercial activity, and said acts have caused a direct effect in the United States.

10. By virtue of Angola's agreements, representations, and conduct, Angola has waived its immunity from jurisdiction. Specifically, Angola entered into the Settlement Agreement, pursuant to which it agreed to compensate AFGC in the amount of USD 47.5 million by making payments to AFGC in the United States, and in particular, to the Florida bank account of AFGC's U.S. legal counsel in exchange for release of AFGC's rights and claims to the real property and businesses that were unlawfully expropriated by Angola. Angola also has waived its immunity from jurisdiction through written communications between representatives of the Angolan government and representatives of AFGC, including undersigned legal counsel.

11. This action likewise is based upon a commercial activity, namely, it arises out of an agreement pursuant to which Angola committed to paying USD 47.5 million to AFGC for the

transfer of all rights to the property owned by AFGC, which is located in Luanda, Angola, and the transfer of all related claims to the Angolan government. Thus, Angola agreed to undertake a commercial transaction in which AFGC agreed to relinquish all of its rights and title in said property to Angola in exchange for payment of USD 47.5 million.

12. Angola is not immune from the jurisdiction of this Court because it undertook acts that caused a direct effect in the United States, including, without limitation, in the following manner:

    a. Angola agreed to pay AFGC USD 47.5 million to a designated bank account in Florida; and

    b. Angola breached its agreement to pay USD 47.5 million to a designated bank account in Florida.

13. AFGC has suffered damages as a direct result of Angola's breach of the Settlement Agreement in an amount in excess of USD 47.5 million.

14. Venue is proper in the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. § 1391(f)(1), in that a substantial and material part of the events or omissions giving rise to the Complaint occurred within this District, specifically Angola breached its contract by failing to perform through payment of USD 47.5 million due and owing in Miami-Dade County, Florida.

## GENERAL ALLEGATIONS

**I. After Angola takes AFGC's Angolan Assets, AFGC files suit and pursues legal remedies against Angola in Angola and the United States.**

15. In early 2015, AFGC formed Angolan-based subsidiaries and legally acquired certain real estate and commercial properties, including registered title thereto, in the Angolan capital of Luanda ("AFGC Properties"). AFGC's wholly-owned Angolan subsidiaries include

4

Illico Lda. ("Illico"), AGPV Lda ("AGPV") and Maximilio Lda ("Maximilio") (collectively, the "AFGC Angolan Subsidiaries"). The AFGC Angolan Subsidiaries own four commercial properties in Angola known as Isha 1, Isha 2, Isha 2.5, and Pina, all located in Luanda, Angola, along with bank accounts and other property (collectively, the "AFGC Angolan Assets"). AFGC managed apartment complexes on these properties and subsequently leased apartment units to Angolan residents and the employees of foreign companies operating in Angola. AFGC intended to use the rental proceeds from the AFGC Properties to build and develop affordable housing units for low- to middle-income families in Angola. The AFGC Angolan Assets comprise a principal asset of AFGC.

16. Beginning in late 2016, Angola, through high-ranking government officials and government agencies, conspired to use fraudulent documents, abuse of power, forgery, intimidation and force of arms to gain control over the AFGC Angolan Subsidiaries in order to seize and expropriate the AFGC Angolan Assets. These actions were taken in clear violation of Angolan and international law.

17. Since the unlawful seizure and expropriation of the AFGC Angolan Assets, AFGC's efforts to obtain legal remedy and compensation in Angola have been blocked, ignored and commercially hindered. Indeed, the Angolan Government has actively refused to enforce orders of the Angolan Court in support of AFGC.

18. Based on the actions of the Angolan government, coupled with the lack of any recourse in Angola and palpable and repeated threats should AFGC persist in its efforts to restore its rights to the AFGC Angolan Assets, AFGC was compelled to seek recourse in the United States courts.[1] In November 2017, AFGC filed an action against Angola in the United States

---

[1] There is no existing bilateral or multilateral investment treaty that would provide AFGC, as a U.S. investor, with a dispute resolution mechanism against Angola, a foreign state. Angola

District Court of the District of Columbia, Case No. 17-2469-BAH ("D.C. Action") to recover: a) the fair market value of the AFGC Properties stolen and rents derived therefrom; b) profits that otherwise would have continued absent the unlawful seizure of the AFGC Properties; c) damages arising from third-party investment opportunities with AFGC that were thwarted by the risks attributed to Angola's expropriation and unlawful conduct; d) reputational damage to AFGC; and e) treble damages to which AFGC may be entitled under the civil RICO statutes, including attorneys' fees.

## II. AFGC and Angola agree to send authorized representatives to meet and discuss settlement of their ongoing dispute.

19. On January 7, 2019, AFGC prepared and sent a letter that was hand delivered to Angolan President Lourenço ("January 7 Letter"). *See* **Exhibit A**. The January 7 Letter summarized the pending dispute arising from Angola's expropriation, unlawful transfer of title, and seizure of control of the AFGC Angolan Assets. The January 7 Letter demonstrated AFGC's willingness to meet with authorized representatives of Angola to settle the pending dispute. Id. ("To expedite a resolution of its claims, AFGC is willing to have a company representative with full settlement authority meet this month with an Angolan government representative (also with full settlement authority) in Portugal, or another suitable location, to amicably resolve this dispute."). For the purpose of ensuring a full and final settlement, AFGC conditioned any settlement meeting on the Angolan government representatives who would be attending having binding authority to settle with AFGC on behalf of the Republic of Angola.

20. On January 30, 2019, AFGC's U.S. legal counsel was contacted in Miami-Dade County, Florida by phone by Dr. Eduarda Rodrigues Neto, Deputy Attorney General for Angola,

---

and the United States signed a Trade and Investment Framework Agreement (TIFA) in 2009, but this agreement is not in force and it provides no investor-state dispute resolution mechanism. Likewise, there is no preexisting treaty concerning immunities and other relevant provisions.

who represented that she had been personally directed and authorized by Angolan President Lourenço to meet with AFGC authorized representatives in Lisbon, Portugal, for the express purpose of settling the pending dispute between AFGC and Angola. The parties exchanged communications between January 31 and February 1, 2019, concerning upcoming settlement negotiations. *See* **Composite Exhibit B.**

21. On February 1, 2019, AFGC worked with its undersigned U.S. counsel to prepare and send a letter to Dr. Rodrigues Neto, as the officially designated representative of Angola for the purpose of settling the relevant dispute ("February 1 Letter"). *See* **Exhibit C**. The February 1 Letter set forth the terms of AFGC's settlement demand to Angola, in particular the demand for cash payment in the amount of USD 55 million, and agreed to the meeting with Dr. Rodrigues Neto, who represented that she was acting on behalf of Angola.

22. A date for the meeting between the designated representatives of AFGC and Angola was mutually agreed and set for February 12, 2019, to begin at 10:00 a.m. local time in the EPIC SANA hotel in Lisbon.

**III.   AFGC and Angolan authorized representatives meet, negotiate and arrive at a mutually agreed final settlement**.

23. On February 12, 2019, as agreed, AFGC met in person with Dr. Rodrigues Neto, who represented again that she was the specially authorized representative for the Office of the Angolan Attorney General and was attending the settlement meeting at the express direction of President Lourenço. Dr. Rodrigues Neto was joined by her colleague, Pedro de Carvalho, who was introduced to AFGC as another Deputy Attorney General for Angola.

24. Also present at the meeting was a respected Portuguese attorney, Ricardo Veloso, who was retained by AFGC to serve as an independent third-party English-Portuguese translator and neutral party during the settlement discussions.

7

25. During the settlement negotiations that day, the parties began by discussing some of the underlying facts of the dispute. After agreeing that AFGC had valid claims against Angola and Angola conceding that it had been "negligent and shared responsibility" for the unlawful actions taken against AFGC, the parties also agreed that no further documentation was required to be exchanged with respect to the relevant facts. Dr. Rodrigues Neto suggested that the parties put aside the factual claims and move on to discuss financial compensation from Angola to AFGC for its losses.

26. AFGC explained at that point how it had arrived at its compromise settlement offer of USD 55 million, as stated in the February 1 Letter. As related to Dr. Rodrigues Neto and her colleague, the actual loss to AFGC arising from Angola's seizure of the AFGC Assets was approximately USD 95 million. This USD 95 million amount is comprised of a loss of shareholder value at USD 72 million (8 million issued shares valued at the time of merger at USD 10/share, then trading at USD 1/share), plus the loss of new and pending investment opportunities into AFGC, lost revenue/profits, reputational damage and significant fees and expenses incurred by AFGC in prosecuting its claims against Angola.

27. Despite the actual estimated losses by AFGC of approximately USD 95 million, the AFGC board of directors, acting on behalf of the public shareholders, communicated to Dr. Rodrigues Neto AFGC's willingness to accept a compromise settlement value of USD 55 million (the minimum value of AFGC's then-pending claims for actual losses in the D.C. Action, as of the time of filing in November 2017) in order to achieve an expedited settlement and payment.

28. In response to AFGC's settlement demand of USD 55 million, Dr. Rodrigues Neto made and handed to AFGC a written counteroffer on behalf of the Angolan government of USD 40 million. *See* **Exhibit D**.

29. AFGC rejected the counteroffer presented by Angola through Dr. Rodrigues Neto. At that point in the meeting, the representatives of AFGC and Angola agreed to separate temporarily and discuss a financial resolution internally before reconvening.

30. Upon deliberating, and in the interest of reaching a final and binding settlement, AFGC agreed to counteroffer in settlement to the Republic of Angola the amount of USD 47.5m, provided the payment was made in a lump sum amount into the Florida bank account of AFGC's Florida legal counsel within 15 calendar days of February 12, 2019, making payment due and owing on February 27, 2019. AFGC asked Mr. Veloso to convey this counteroffer to the Angolan representatives.

31. Mr. Veloso agreed to serve as intermediary to discuss settlement amounts and terms with the parties, as he could communicate in both English and Portuguese and possessed some general knowledge of the circumstances underlying the parties' dispute. Mr. Veloso then met privately with Dr. Rodrigues Neto and her colleague. Mr. Veloso then returned to AFGC, conveyed that Dr. Rodrigues Neto had made a call to a senior Angolan government official (in either the Attorney General's or President's office), and that the Angolan government was prepared to pay USD 47.5 million in full and final settlement under the conditions proposed by AFGC.

32. Representatives of the parties reconvened to discuss the other agreed terms of the settlement. Scott Mortman, Executive Chair of AFGC, wrote out the agreed terms of the settlement on paper. *See* **Exhibit E**.

33. Mr. Mortman of AFGC read out loud all of the terms of the Settlement Agreement in English to Dr. Rodrigues Neto and her colleague. Mr. Veloso interpreted the terms of the Settlement Agreement at the time into Portuguese. Dr. Rodrigues Neto took handwritten

notes as the terms were being read and translated. After hearing all of the terms, Dr. Rodrigues Neto and her colleague confirmed the terms of the Settlement Agreement between the parties.

34. The Settlement Agreement between Angola and AFGC negotiated and freely entered at the February 12 meeting provides as follows:

> *1. The Republic of Angola has agreed to pay AFGC the amount of USD 47.5 million (forty seven million five hundred thousand US dollars).*
>
> *2. The above amount will be paid within 15 calendar days of today, February 12, 2019, [so that the final fifteenth day will be February 27, 2019, which is the day by which payment shall be made according to paragraph 1].*
>
> *3. The above amount will be paid net (free of) any Angolan taxes or any Angolan expatriation or transfer charges.*
>
> *4. The above amount [mentioned in paragraph 1] will be paid by wire transfer into the attorney trust bank account held in the State of Florida, US, by AFGC US counsel, Shutts & Bowen. The wire transfer details for that US account will be provided.*
>
> *5. AFGC agrees to waive and relinquish all of its rights and claims to the properties owned by AFGC in Angola.*
>
> *6. AFGC will withdraw its lawsuit in the US and end all of its global lobbying efforts against the Republic of Angola immediately upon payment in full as set forth above.*
>
> *7. The parties have agreed to memorialize these settlement terms in a more detailed written memorandum to be provided by and on behalf of the Republic of Angola and approved and agreed to by AFGC.*
>
> *8. The parties have agreed to meet again on Monday, February 18, 2019, in Lisbon, Portugal to sign the written settlement memorandum.*

35. Before ending the settlement meeting, Mr. Mortman read the terms of the Settlement Agreement a second time to Dr. Rodrigues Neto and her colleague so that there could be no claim of misunderstanding. Again, Mr. Veloso performed a consecutive interpretation of the terms into Portuguese. Again, Dr. Rodrigues Neto confirmed and agreed to the terms of the Settlement Agreement as read.

36. When AFGC asked Dr. Rodrigues Neto to sign the Settlement Agreement, Dr. Rodrigues Neto confirmed that the Angolan government would undertake to further memorialize the Settlement Agreement in a more formal writing, and that the parties would reconvene in Lisbon the following week, on February 18, 2019, to sign this document. Dr. Rodrigues Neto added that the sole reason for creating the subsequent writing for signature was to accommodate certain formalities required by the National Bank of Angola for the payment of funds outside Angola.

37. Dr. Rodrigues Neto affirmed unequivocally at this time that the Settlement Agreement was a valid agreement that had the approval of the Republic of Angola and President Lourenço, who had personally directed to her that the AFGC matter be settled at the February 12 meeting, and stated expressly that the terms of the Settlement Agreement would be honored. Specifically, Dr. Rodrigues Neto stated that the Settlement Agreement "had the support of the President" and that AFGC could "be assured that the President would fulfill his promise and honor his agreement" with AFGC.

38. The Angolan and AFGC authorized representatives then concluded the settlement meeting and departed. AFGC had every reasonable expectation, based on the events as described above, that the Republic of Angola would honor its commitments and observe the agreed terms of the Settlement Agreement.

39. On February 12, 2019, AFGC sent an email to Dr. Rodrigues Neto confirming the Settlement Agreement in English. *See* **Exhibit F**.

40. On February 14, 2019, undersigned U.S. counsel for AFGC sent an email to Dr. Neto confirming the terms of the Settlement Agreement in English and Portuguese. It was suggested that the parties enter into a stay of the pending D.C. Action, until such time as AFGC

receives payment in full from Angola as agreed, after which AFGC would dismiss its claims in that lawsuit with prejudice.

41. Despite additional efforts by AFGC corporate representatives and its U.S. counsel to contact Dr. Rodrigues Neto by email and telephone on several occasions after February 12, 2019, Dr. Rodrigues Neto initially failed to respond to any of AFGC's communications. On February 17, 2019, Dr. Rodrigues Neto finally communicated with AFGC's U.S. counsel by phone, indicating that Angola would be unable to reconvene in Lisbon and meet with AFGC's representatives on the following day as agreed.

42. On February 18, 2019, U.S. counsel for AFGC emailed Dr. Rodrigues Neto to express regrets that the parties were unable to reconvene in Lisbon as agreed that day to sign the document required by the National Bank of Angola, which would further memorialize the Settlement Agreement entered between AFGC and Angola on February 12, 2019, but that AFGC expected Angola would nonetheless make the USD 47.5 million settlement payment under the Settlement Agreement as previously agreed on or before February 27, 2019. *See* **Exhibit G**.

43. On February 22, 2019, AFGC drafted and sent a letter to Angolan President Lourenço affirming the terms of the Settlement Agreement and indicating that AFGC expected Angola would fulfill its obligations under the settlement agreement by making the USD 47.5 million settlement payment as agreed on or before February 27, 2019. Further, AFGC made clear in its February 22 letter that it would file a new legal action against the Republic of Angola for breach of the Settlement Agreement if Angola failed to make the agreed upon payment by the agreed deadline. *See* **Exhibit H**.

**IV.    Angola breaches the Settlement Agreement with AFGC; Angolan President Lourenço refuses to honor his commitments to AFGC.**

44.    On February 23, 2019, Dr. Rodrigues Neto responded in writing to address AFGC's February 22 letter. Dr. Rodrigues Neto denied for the first time that the parties had, in fact, reached a final and binding Settlement Agreement on February 12, 2019, thus ignoring that: (1) a respected Portuguese lawyer, acting as a third-party translator and neutral party, had been present throughout the February 12, 2019 settlement discussions and could testify independently as to what had occurred; and (2) Dr. Rodrigues Neto had made express representations and binding legal commitments before and during the February 12 settlement discussions on behalf of Angola and Angolan President Lourenço. *See* **Exhibit I**.

45.    On February 24, 2019, AFGC replied to Dr. Rodrigues Neto's email from the day prior and refuted the false contentions therein. AFGC reaffirmed that it had every reasonable expectation that, despite the misrepresentations contained in Dr. Rodrigues Neto's February 23 email, Angola would honor the Settlement Agreement and uphold the commitments made by President Lourenço and make the agreed USD 47.5 million settlement payment on or before February 27, 2019. *See* **Exhibit J**.

46.    Angola failed to make the agreed USD 47.5 million settlement payment on or before February 27, 2019, or anytime thereafter.

47.    On April 4, 2019, AFGC obtained the sworn written statement of Ricardo Veloso, the Portuguese lawyer who had been present during the February 12 settlement discussions. This sworn statement fully corroborated AFGC's understanding and representations of what had occurred during the February 12 settlement discussions and affirmed that Angola had agreed to a final and binding Settlement Agreement on February 12, 2019.  This sworn statement also

directly refutes the false contentions set forth in Dr. Rodrigues Neto's February 23, 2019 email to AFGC. *See* **Exhibit K**.

48. On March 1, 2019, AFGC prepared and sent another letter to Angolan President Lourenço. This March 1 letter advised President Lourenço as to actions AFGC would be forced to take if Angola breached the Settlement Agreement and if President Lourenço failed to honor the commitments he had made to AFGC. *See* **Exhibit L**.

49. To date, Angola has failed to fulfill its obligations under the Settlement Agreement, specifically in making the agreed USD 47.5 million settlement payment to AFGC.

50. Further, by breaching the Settlement Agreement, Angola has demonstrated that Angolan President Lourenço will not honor his commitments to AFGC relating to the Settlement Agreement as freely negotiated and entered between AFGC and Angola.

51. All conditions precedent to the bringing of this action have been performed by AFGC.

<u>**COUNT I**</u>
**Breach of Contract**

52. AFGC reaffirms and re-alleges paragraphs 1 through 51 above with the same force and effect as if fully set forth herein.

53. On February 12, 2019, Angola and AFGC agreed to the Settlement Agreement, pursuant to which Angola agreed to pay AFGC USD 47.5 million in exchange for and as compensation for the AFGC Assets in Angola. Angola is obligated to make this payment to AFGC through AFGC's counsel's trust account in Florida.

54. Angola has breached the agreement by failing to pay all or any portion of the USD 47.5 million agreed upon payment.

55. Angola's non-payment has directly caused monetary loss and damage, including but not limited to, the USD 47.5 million compensation for the settlement of the prior action and as payment for the AFGC Angolan Assets and further damages to AFGC resulting from the breach.

**WHEREFORE**, AFGC demands judgment for damages against Defendant, including compensatory damages in the amount due and owing under the Settlement Agreement, other damages resulting from the breach, prejudgment interest, costs, and all such other relief this Court deems just, fair, and equitable.

### COUNT II
### Unjust Enrichment

56. AFGC reaffirms and re-alleges paragraphs 1 through 51 above with the same force and effect as if fully set forth herein.

57. Angola wrongfully gained more than USD 55 million worth of property, the AFGC Angolan Assets, without providing any compensation to AFGC. Angola would be unjustly enriched should it be allowed to retain the AFGC Angolan Assets and withhold payment to AFGC.

58. AFGC conferred a benefit upon Angola, in the form of the AFGC Angolan Assets that Angola has obtained from AFGC.

59. Angola appreciated the benefit that AFGC conferred and has accepted the AFGC Angolan Assets without providing any compensation for said property.

60. It would be inequitable for Angola to retain the benefit conferred without paying the fair and reasonable value thereof.

61. AFGC has no adequate remedy at law.

62. As a result of the foregoing, AFGC has suffered damages.

**WHEREFORE**, AFGC demands judgment for damages against Defendant, including compensatory damages, prejudgment interest, costs, and all such other relief this Court deems just, fair, and equitable.

Dated: May 16, 2019

>Respectfully submitted,
>
>SHUTTS & BOWEN LLP
>200 S. Biscayne Boulevard
>Suite 4100
>Miami, Florida 33131
>Tel.: (305) 358-6300
>Fax: (305) 381-9982
>
>By: */s/ Harold E. Patricoff*
>      Harold E. Patricoff
>      Fla. Bar No. 508357
>      hpatricoff@shutts.com
>      Kristin Drecktrah Paz
>      Fla. Bar No. 91026
>      kpaz@shutts.com
>      *Attorneys for Plaintiff Africa Growth Corporation*

## VERIFICATION PURSUANT TO 28 U.S.C. § 1746

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 16, 2019

_____
Scott Mortman