**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 19-21995-Civ-WILLIAMS/TORRES

AFRICA GROWTH CORPORATION,

     Plaintiff,

v.

REPUBLIC OF ANGOLA,

     Defendant.

_____/

**REPORT AND RECOMMENDATION**
**ON DEFENDANT'S MOTION TO DISMISS**

This matter is before the Court on the Republic of Angola's ("Defendant" or "Angola") motion to dismiss against Africa Growth Corporation ("Plaintiff" or "Africa Growth") on the basis that this case lacks jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.* [D.E. 51]. Plaintiff responded to Defendant's motion on April 30, 2020 [D.E. 59] to which Defendant replied on June 1, 2020. [D.E. 60]. Therefore, Defendant's motion is now ripe for disposition. After careful consideration of the motion, response, reply, relevant authority, and for the reasons discussed above, Defendant's motion to dismiss should be **GRANTED** for lack of subject matter jurisdiction and the case Closed.[1]

---

[1]     On July 28, 2020, the Honorable Kathleen Williams referred Defendant's motion to dismiss to the undersigned Magistrate Judge for disposition. [D.E. 79].

## I.    BACKGROUND

Plaintiff filed this action on May 16, 2019 [D.E. 1], alleging breach of contract and unjust enrichment.  The facts of this case relate to an attempt to resolve a long-running dispute in connection with Defendant's seizure and expropriation of assets and real property.  Plaintiff originally sued Defendant in the District of Columbia for damages, together with five Angolan individuals. The complaint specifically alleged claims relating to the alleged unlawful seizure and expropriation of apartment buildings in Luanda, Angola, over which Plaintiff held enforceable property interests.  Defendant moved to dismiss that case, in part, on the basis that the action lacked subject matter jurisdiction under the FSIA.

Before that motion was adjudicated, as Plaintiff alleges in this complaint filed in the Southern District of Florida, on February 12, 2019, the parties met in Lisbon, Portugal to try to settle the case.  Plaintiff claims that they orally negotiated a final resolution of all claims and issues between the parties.  The agreement provided that Angola would pay Plaintiff $47.5 million dollars via a wire transfer to Plaintiff's lawyers, due in 15 days, in exchange for the release of rights and claims to real property that Defendant expropriated.  Plaintiff claims that, during the negotiations, Defendant represented that the agreement had the personal approval and support of Angolan President Joao Lourenco.  However, when the time came for Defendant to make the required payment as consideration, Plaintiff alleges that Defendant failed to wire any funds to a Florida bank account and that Defendant breached the settlement agreement.  Plaintiff therefore seeks

the immediate enforcement of the agreement, including compensatory damages, prejudgment interest, and costs.

But Plaintiff did not seek that relief in the District of Columbia as one would expect. Instead, it is undisputed that, even after the alleged wire transfer was never made and Defendant breached, Plaintiff only moved to dismiss the case several months later without seeking relief for the alleged breach. That court decided, however, to dismiss the case on July 19, 2019, pursuant to the pending motion to dismiss. The court held that the action was indeed barred under the FSIA. But Plaintiff claims that that is inconsequential because it had the right to "elect its remedies" from the purported oral agreement and sue in this District. And this Florida action is predicated entirely on the alleged breach of the settlement agreement, rather than the underlying claim of expropriation of assets at issue in the District of Columbia. Plaintiff thus concludes that the earlier action is immaterial to the resolution of this case, and hence the Court need not take note of the fact that the Plaintiff's original complaint was dismissed.

Defendant, not surprisingly, has a different view. On August 30, 2019, Defendant moved to dismiss Plaintiff's complaint on the basis (1) that Plaintiff's unjust enrichment claim was barred under *res judicata*, (2) that the Court lacked jurisdiction under the FSIA, (3) that the Court lacked personal jurisdiction, (4) that venue was improper, and (5) that Plaintiff's complaint failed to state a claim. Plaintiff subsequently filed a motion for leave to amend and the Court granted that motion on February 25, 2020. [D.E. 48]. The amended complaint differs from the

3

original in that it revised the unjust enrichment count, seeks additional compensatory damages, and includes other facts in support of Plaintiff's reliance on the commercial activity exception to the FSIA.

## II. ANALYSIS

On March 10, 2020, Defendant filed a renewed motion to dismiss Plaintiff's amended complaint. [D.E. 51]. Defendant does not dispute the factual allegations in the pleading. Instead, Defendant accepts the allegations as true and contends that the amended complaint fails on its face to establish jurisdiction under the FSIA. Defendant also argues that venue does not exist in this District and that, if all else fails, the amended complaint should still be dismissed because it failed to state a plausible claim for breach of contract and unjust enrichment under the law that governs the case.

Plaintiff opposes each of Defendant's arguments. Plaintiff claims that the Court has subject matter jurisdiction under the commercial activity exception of the FSIA because the parties entered into a binding settlement agreement to resolve their disputes, and that Defendant's acts caused a direct effect on the United States. Plaintiff also asserts that venue is proper because Defendant was obligated to pay $47.5 million dollars to a Florida bank account. Plaintiff finally argues that the complaint satisfies the elements for a breach of contract and unjust enrichment claim. Because Defendant has misinterpreted both the facts and the law, Plaintiff concludes that the motion to dismiss should be denied in all respects.

### A.   *General Principles of the Foreign Sovereign Immunities Act*

Before reaching the merits, we must set forth the principles governing the FSIA because that will inform whether the Court has jurisdiction over this action. Under the FSIA, a foreign state is immune from the jurisdiction of both the federal and the state courts, except as provided by international agreements, *see* 28 U.S.C. § 1330(a); *id.* § 1604, by specifically enumerated exceptions, *see id.* § 1605(a)(1)-(7), (b), (d), or by certain other exceptions relating to counterclaims in actions brought by the foreign state itself, *see id.* § 1607.  If no exception applies, a foreign sovereign's immunity under the FSIA is complete and a state or federal court does not have subject matter jurisdiction over a plaintiff's case.  *See Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 443 (1989) ("The FSIA provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country."); *see also Vermeulen v. Renault, U.S.A., Inc.,* 985 F.2d 1534, 1543 (11th Cir. 1993) (noting that FSIA is "[t]he only possible source of federal jurisdiction in suits against corporations owned by foreign states").

"If sovereign immunity exists, then the court lacks both personal and subject matter jurisdiction to hear the case and must enter an order of dismissal." *de Sanchez v. Banco Cent. De Nicaragua*, 770 F.2d 1385, 1389 (5th Cir. 1985) (internal citations omitted).  Conversely, "[i]f an exception does apply, the district court has jurisdiction." *Architectural Ingenieria Siglo XXI, LLC v. Dominican Republic*, 2015 WL 7760057, at *4 (S.D. Fla. Dec. 2, 2015) (citing *Butler v. Sukhoi Co.*, 579 F.3d 1307, 1312 (11th Cir. 2009)); *see also Argentine Republic v. Amerada Hess Shipping*

*Corp.*, 488 U.S. 428, 434 (1989) (stating that the FSIA provides the "sole basis for obtaining jurisdiction over a foreign state in [U.S.] courts").

To establish subject matter jurisdiction, a plaintiff must overcome the presumption that a foreign state is immune from suit by producing evidence that "the conduct which forms the basis of [the] complaint falls within one of the statutorily defined exceptions." *S & Davis Int'l, Inc. v. The Republic of Yemen*, 218 F.3d 1292, 1300 (11th Cir. 2000); *see also In re Terrorist Attacks on September 11, 2001,* 538 F.3d 71, 80 (2d Cir. 2008) (finding that a plaintiff has the burden of producing evidence showing that, under exceptions to the FSIA, immunity should not be granted). Whether the plaintiff has satisfied his burden of production is determined by looking at "the allegations in the complaint [and] the undisputed facts, if any, placed before the court by the parties." *In re Terrorist Attacks,* 538 F.3d at 80 (quotation marks, alterations, and citation omitted). Once the plaintiff demonstrates that one of the statutory exceptions to FSIA immunity applies, the burden then shifts to the defendant to prove, by a preponderance of the evidence, that the plaintiff's claims do not fall within that exception. *See S & Davis Int'l,* 218 F.3d at 1300; *Arango v. Guzman Travel Advisors Corp.,* 621 F.2d 1371, 1378 (5th Cir. Unit B 1980).

Attacks on subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), such as under the FSIA, come in two forms: (1) "facial attacks" on the which require the court to draw all reasonable inferences in favor of the plaintiff to see if the plaintiff has sufficiently alleged a basis for subject matter jurisdiction;

and (2) "factual attacks," which "challenge the existence of subject matter jurisdiction in fact" and require the court to consider matters outside the pleadings because no presumption of truthfulness attaches to plaintiff's allegations. *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (internal citations omitted).

### B.      *Whether Plaintiff's Claims are "Based Upon" Commercial Activity*

Based on these legal principles, Defendant first argues that Plaintiff's complaint should be dismissed because – even when accepting all the allegations in the amended complaint as true – the Court lacks jurisdiction over this case under the FSIA. The decision to accept each jurisdictional allegation as true represents a facial attack on Plaintiff's amended complaint because Defendant "does not contest the [complaint's] alleged jurisdictional facts, but rather, challenges their legal adequacy[.]" *Butler v. Sukhoi Co.*, 579 F.3d 1307, 1313 (11th Cir. 2009). When a facial attack is made, a plaintiff bears the burden "of presenting a *prima facie* case that jurisdiction exist[s]." *Id.* (citing *S & Davis Int'l,* 218 F.3d at 1300). And to determine whether a plaintiff has met that burden, courts review "the complaint's jurisdictional allegations to determine whether they [are] sufficient to eliminate [a foreign state's] presumptive immunity." *Id.* (citing *Mwani v. bin Laden*, 417 F.3d 1, 15-16 (D.C. Cir. 2005) (where foreign sovereign did not expressly concede plaintiffs' factual allegations but argued that the allegations, even if substantiated, were insufficient to trigger FSIA exception, sovereign's argument was a challenge to the legal sufficiency of the allegations subject to *de novo* review)); *see also Chudasama v. Mazda Motor Corp.,* 123 F.3d 1353, 1367 (11th Cir. 1997) (noting that a facial

7

challenge to the legal sufficiency of a claim or defense, unlike a denial of the complaint's factual allegations, "always presents a purely legal question").

Defendant argues that Plaintiff's amended complaint should be dismissed because it is not "based upon" commercial activity.   The commercial activity exception applies if one of three actions occur:

> [T]he action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).  The parties agree that only the third prong is at issue.  For jurisdiction to exist under the third prong "'1) the lawsuit must be based upon an act that took place outside the territory of the United States[2]; 2) the act must have been taken in connection with a commercial activity[;] and 3) the act must have caused a direct effect in the United States.'"  *Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1224 (11th Cir. 2018) (quoting *de Csepel v. Republic of Hung.*, 714 F.3d 591, 598 (D.C. Cir. 2013)).

Defendant views the alleged acts as those committed by a sovereign state because Plaintiff claims that there was an "agreement pursuant to which Angola committed to paying USD 47.5 million to [Africa Growth] . . . for the transfer of all rights to the property owned by [Africa Growth], which is located in Luanda, Angola . . . [and Africa Growth] agreed to relinquish all of its rights, title, and any potential

---

[2]    Neither party disputes that the lawsuit is based on activity that took place outside the United States – i.e. Portugal.  The parties disagree, however, on the second and third prongs.

claims to said property[.]"  [D.E. 50 at ¶ 10].  Defendant posits that the "property" at issue is the seizure "of assets and real property," *id.* ¶ at 10, and that the agreement between the parties was intended to compensate for a wrongful taking. Because these takings are sovereign-based, as opposed to that of a private actor, Defendant concludes that the commercial activity exception does not apply.

Plaintiff disagrees because the parties entered into a binding settlement agreement and Defendant failed to wire funds to a Florida bank account.  That is a quintessential commercial agreement that private parties can and do enter into.  So while Defendant focuses on the reasons for entering into the settlement agreement, Plaintiff looks to the breach that triggered this lawsuit.  Plaintiff contends that Defendant's actions are commercial in nature because any private party can enter into a settlement agreement and then breach it by failing to uphold its end of a bargain.  In other words, Plaintiff views this case as a breach of contract and posits that the underlying reasons for the negotiation of the agreement (i.e. the unlawful seizure and expropriation of assets and real property) are irrelevant.  Plaintiff therefore frames the questioned presented as whether Defendant engaged in activities that could include private actors.  And because entering into a contract is a commercial activity as opposed to an activity restricted solely to foreign states, Plaintiff concludes that this case is "based upon" a commercial activity and that the Court has jurisdiction under this exception.

### 1. *Identifying the Underlying Conduct*

To determine whether the allegations in this case should be considered commercial or sovereign, the first step is to "identify the conduct upon which the suit is based." *Devengoechea*, 889 F.3d at 1222 (citing *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 396 (2015)). "That, in turn, requires us to look at 'the 'particular conduct' that constitutes the 'gravamen' of the suit.'" *Id.* (quoting *OBB Personenverkehr AG*, 136 S. Ct. at 396). The focus should be on the "core" of the suit or, to put it simply, the foreign state's "acts that actually injured" the plaintiff. *Id.*; *see also Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 107 (2d Cir. 2016) (quoting *Black's Law Dictionary* 817 (10th ed. 2014) (defining "gravamen" as "[t]he substantial point or essence of a claim, grievance, or complaint")).

The Supreme Court's decisions in *Nelson* and *Sachs* are instructive on how this concept operates in practice. In *Saudi Arabia v. Nelson*, the plaintiff was in the United States when he was recruited for a position in a Saudi Arabia Government-controlled hospital. *See* 507 U.S. 349, 351-52 (1993). The plaintiff signed a contract in the United States to work at a Saudi hospital. *Id.* at 352. While working there, the plaintiff discovered several safety hazards and reported them to the hospital, but the hospital instructed him to ignore the problems. *Id.* Shortly thereafter, agents of the Saudi Government arrested, tortured, beat, and imprisoned the plaintiff for over a month. *Id.* at 352–53.

The plaintiff sued Saudi Arabia and its hospital with allegations of intentional torts including battery, unlawful detainment, wrongful arrest and imprisonment, false imprisonment, inhuman torture, disruption of normal family life, and infliction of mental anguish.  *Id.* at 353-54.  To support the "based upon" requirement, the plaintiff relied on the facts that Saudi Arabia had recruited him to work at the hospital, had signed an employment contract with him, and had ultimately employed him.  *Id.* at 358.  The Supreme Court held that no jurisdiction existed under the FSIA because the plaintiff's claims were not "based upon" these acts.  *Id.*  Instead, the plaintiff's tort claims were based on Saudi Arabia's tortious conduct and that did not constitute "commercial activity."  *Id.*  Saudi Arabia undertook its tortious conduct by exercising the powers of the police and penal officers – actions that were peculiarly sovereign in nature and therefore not "commercial."  *Id.* at 361-63.

Likewise ,in *Sachs*, the Supreme Court applied the meaning of "based upon" in the context of a lawsuit relying on the first clause of the commercial-activity exception, so the plaintiff had to show that her action was "based upon a commercial activity carried on in the United States by the foreign state."  136 S.Ct. at 394 (quoting 28 U.S.C. § 1605(a)(2)).  Sachs was a California resident who bought a ticket in the United States for rail travel in Europe.  *Id.* at 393. Unfortunately, she fell onto the tracks at a station in Austria while trying to board a train operated by the Austrian state-owned railroad company and, as a result, she suffered traumatic injuries.  *Id.*  She then sued Austria for negligence, strict liability for

design defects, strict liability for failure to warn of design defects, breach of an implied warrant of merchantability for providing a train and platform unsafe for their intended uses, and breach of an implied warranty of fitness for providing a train and platform unfit for their intended uses. *Id.* Sachs relied on the sale of the train pass in the United States to establish that her claims were "based upon" commercial activity because the sale of the pass was an element of each of her claims. *Id.* at 394–95.

The Supreme Court disagreed, however, for several reasons. First, the Court concluded that Sachs's claims were not "based upon" the sale of the train pass because there was "nothing wrongful about the sale of the Eurail pass standing alone." *Id.* at 396. Second, the Court found that the conduct making up the gravamen of Sachs's lawsuit happened in Austria because "[a]ll of her claims turn[ed] on the same tragic episode" that occurred there. *Id.* Nevertheless, the Court did caution that "[d]omestic conduct with respect to different types of commercial activity may play a more significant role in other suits . . . ." *Id.* at 397 n.2. And importantly, the Court recognized that the gravamen of different claims may occur in different locations. *Id.*

Applying these concepts to this case, the conduct that injured Plaintiff was "Angola's unlawful seizure and expropriation of assets and real property lawfully owned by [Africa Growth] and its Angolan subsidiaries," because that is why the parties entered into a settlement agreement in the first place. [D.E. 50 at ¶ 2]. Plaintiff self-servingly disagrees because the focus should simply be on the

settlement agreement and the breach that followed.  But, the breach of the settlement agreement is not what "actually injured the plaintiff." *Devengoechea*, 889 F.3d at 1223 (finding that the actual injury was the defendant's decision to neither pay plaintiff nor return a collection of historical artifacts because the "causes of action – breach of contract and unjust enrichment – turn on this circumstance.").  That was the seizure and expropriation of commercial buildings, bank accounts, and real property.  [D.E. 50 at ¶ 14].  In other words, the core injury here took place well before the parties ever entered into an alleged oral agreement.  The Supreme Court teaches us that we must turn our lens on that injury in applying the FSIA.

Indeed, Plaintiff's own amended complaint makes this clear, as throughout its pleading Plaintiff explains that these are the reasons for entering into the settlement agreement, and then asserts repeatedly that this case arises out of the taking of Plaintiff's assets.  *Id*. at ¶ 51 ("Since the dispute between AFGC and Angola began – arising out of the uncompensated taking of the AFGC Angolan Assets").  Yet Plaintiff seeks to divert attention from these allegations even though both of its claims are grounded on Angola's seizure and expropriation of assets.

For example, with respect to the breach of contract claim, Plaintiff alleges that Angola's failure to tender $47.5 million dollars in compensation for the seizure of Plaintiff's assets constitutes the breach.  And for the unjust enrichment claim, Plaintiff alleges that Angola's decision to retain those same funds and withhold payment led to Angola receiving a windfall.  Therefore, the conduct upon which this

13

suit is based is the expropriation of real property.  For purposes of applying the FSIA, that conclusion is pivotal because we are duty bound to "identify the conduct upon which the suit is based."  *Devengoechea*, 889 F.3d at 1222.

### 2. *Determining whether a Taking is a Sovereign or Commercial Act*

The next question is whether a taking of commercial buildings, bank accounts, and real property is considered a commercial or sovereign act.  "The touchstone for determining if a foreign government's act is commercial is whether the *nature* of the act is public or private."  *Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323, 1325 (11th Cir. 2003) (emphasis in original) (citing *Weltover,* 504 U.S. at 618).  The Supreme Court has defined commercial acts as those that allow for the participation of a private party.  *See Weltover*, 504 U.S. at 618.  Public acts, on the other hand, require sovereign power and thus cannot be performed by a private party.  *Id*.  The Court has emphasized that public acts must make use of a state's sovereign authority:

> [W]e conclude that when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are "commercial" within the meaning of the FSIA. . . . [T]he issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in "trade and traffic or commerce."  Thus, a foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party; whereas a contract to buy army boots or even bullets is a "commercial" activity, because private companies can similarly use sales contracts to acquire goods.

*Id.* at 614 (citations omitted).

A foreign government's act is thus commercial if it is the type of transaction that private actors can complete.   For example, in *Weltover,* the Supreme Court found that Argentina's issuance of bonds to finance a currency-exchange program was a commercial activity because private corporations can also raise capital through the issuance of debt instruments in the same manner. *See id.* at 616.  The Eleventh Circuit, in the same vein, determined that the Government of Yemen engaged in commercial activity when it entered into a contract to purchase grain from an American corporation because the contract was "just a contract and . . . not based upon regulatory reasons." *S & Davis Int'l,* 218 F.3d at 1303.

"By contrast, a government's regulation of the market, [the] use of [its] police power, or other activities requiring state authority are not commercial." *Beg*, 353 F.3d at 1326 (citing *Nelson,* 507 U.S. at 359–63 (finding that the alleged detention and torture by Saudi police of an American citizen, who had entered into an employment contract with a state hospital, was not commercial activity); *Weltover,* 504 U.S. at 614 (determining that the regulation of foreign exchange policy is sovereign activity)).  For instance, the plaintiff in *Nelson* claimed that the Saudi government's detention and torture was not commercial because the government had entered into an employment contract with him.   But, the Supreme Court determined that the tortious activity was pursuant to the state's police power and was "not the sort of action by which private parties can engage in commerce." *Nelson*, 507 U.S. at 362.   And although there was an employment contract between the two parties, the basis of Nelson's claim was the tortious

conduct by government agents.  *See id.* at 361–63.  Thus, the Court determined that foreign government acts, "however monstrous," that are "peculiarly sovereign in nature" are not subject to review by our courts under the FSIA's commercial activities exception.  *Id.*at 361.

The same reasoning applies in this case because, although Plaintiff's two causes of action are premised on a breach of contract and an unjust enrichment claim – the actual wrongful conduct was the seizure and expropriation of assets and real property that purportedly injured Plaintiff.   Plaintiff admittedly does not tackle how the taking of these assets constitute commercial activity because Plaintiff placed all of its eggs in one basket – the argument that the breach of the settlement agreement was the real gravamen of this lawsuit.  But, for the reasons already discussed, that cannot be.  And Plaintiff has failed to reference any FSIA case where a court has begun and ended its analysis by looking solely to the existence of a single commercial contract as the end all and be all of FSIA review.

Indeed the Eleventh Circuit has cautioned district courts against the position that Plaintiff now advances because "[i[n ascertaining  the gravamen of a complaint, courts are to focus on the core conduct giving rise to the suit rather than individually analyzing the elements of each cause of action.  This approach prevents plaintiffs from side-stepping the FSIA's limitations 'through artful pleading.'" *Sequeira v. Republic of Nicaragua*, 2020 WL 2499808, at *4 (11th Cir. May 14, 2020) (quoting *OBB Personenverkehr AG*, 136 S. Ct. at 396).   And the Eleventh Circuit has directly held that the taking of real property is a power reserved to a

16

sovereign power – not a private actor.  *See, e.g.*, *Beg*, 353 F.3d at 1326 ("Confiscation of real property is a public act because private actors are not allowed to engage in 'takings' in the manner that governments are.") (citing *Shakour v. Fed. Republic of Germany,* 199 F.Supp.2d 8, 13 (E.D.N.Y. 2002) (finding that the German Democratic Republic's expropriation of three factories is a public, not a commercial act); *Haven v. Polska,* 215 F.3d 727, 736 (7th Cir. 2000) (determining that the commercial activity exception did not apply to expropriation of real property in Poland because it was not based upon any commercial activity within the United States)).

In cautioning us against a litigant side-stepping the FSIA through "artful pleading," the Eleventh Circuit was prescient.  That is exactly what this amended complaint is all about.  Plaintiff argues forcefully how it has been damaged by Defendant's wrongful conduct in Angola.  But rather than pursuing its legal positions in the forum it chose to consider that conduct, which admittedly proved difficult when the court dismissed the case under the FSIA, Plaintiff took a very different path to "elect its remedies:" by filing this lawsuit seeking relief in this jurisdiction for a purported oral agreement entered into in Lisbon, Portugal.  And Plaintiff claims it can do so simply because it has the right to enforce a basic commercial contract.  Artful pleading indeed.

But wait, there is more.  Another reason Angola's alleged actions fall outside the scope of the FSIA is because "[d]etermining whether or how to compensate property owners for takings is also a sovereign function, not a market transaction."

17

*Beg*, 353 F.3d at 1327 (citing *United States v. Carmack*, 329 U.S. 230, 236-37 (1946)). That is exactly the case here because the settlement agreement between the parties was an attempt to compensate Plaintiff for the taking of real property. And the Supreme Court has specifically stated that expropriation does not take place in a free-market setting:

> The power of eminent domain is essential to a sovereign government. If the United States has determined its need for certain land for a public use that is within its federal sovereign powers, it must have the right to appropriate that land. Otherwise, the owner of the land, by refusing to sell it or by consenting to do so only at an unreasonably high price, is enabled to subordinate the constitutional powers of Congress to his personal will. The Fifth Amendment, in turn, provides him with important protection against abuse of the power of eminent domain by the Federal Government.

*Carmack,* 329 U.S. at 236-37.

Thus, while Plaintiff maintains that the settlement agreement with Angola is commercial activity and that the analysis should stop there, that contention is unavailing because the gravamen of this case is the expropriation of real property and that is *not* an activity in which private actors can engage.[3] *Sequeira*, 2020 WL 2499808, at *4 ("The commercial-activity exception does not apply here because Sequeira's amended complaint was based on the alleged taking of his land, which is not a commercial activity.") (citing *Beg*, 353 F.3d at 1327-28 ("Beg contends that the Punjabi regional government's agreement to compensate him is the equivalent of a

---

[3]     We further note that, even if we focused solely on the contract and not the actual harm that caused the injury, the result remains the same. That is, the result is no different because the contract in this case is to resolve the taking of real property. And private actors cannot enter these types of contracts because they cannot expropriate real property in the first place. That power belongs solely to a sovereign state. This is yet another reason why the activity in this case is sovereign – not commercial.

contract and, therefore, is commercial activity. This analogy is not persuasive," because "[e]xpropriation is neither the type of activity in which private actors engage nor is it a market transaction.")); *see also Devengoechea*, 889 F.3d at 1228 ("[E]xpropriation is a uniquely sovereign act, as opposed to a private act," because "[s]imilar to the concept embodied in our Fifth Amendment to the U.S. Constitution, FSIA expropriation involves sovereign 'takings' of property, without just compensation.") (citing authorities).

### 3. *Considering the Notices of Supplemental Authority*

Having now considered all of the cases presented in the underlying motion to dismiss, Plaintiff requests that we consider additional cases included in its first notice of supplementary authority that Plaintiff filed on July 23, 2020.[4] This notice directed the Court's attention to the Second Circuit's recent decision in *Fontana v. Republic of Argentina*, 962 F.3d 667, 673 (2d Cir. 2020). The plaintiffs in that case filed a lawsuit against Argentina seeking payment on defaulted bonds. The

---

[4]     We note that we need not even consider Plaintiff's notices of supplemental authority because Plaintiff violated Local Rule 7.1(c). That rule authorizes only opposing and reply briefs. The rule also makes clear that "no further or additional memoranda of law shall be filed without prior leave of Court." Local Rule 7.1(c). Yet, Plaintiff included arguments in support of its notices of supplemental authority in violation of the Local Rule. *See, e.g.*, *Barron v. Snyder's-Lance, Inc.*, 2014 WL 2686060, at *1 (S.D. Fla. June 13, 2014) (stating that, while "supplemental filings should direct the Court's attention to legal authority or evidence . . . [they] should do nothing more. In particular, they should not make legal arguments.") (citations omitted). Plaintiff's notices are also defective because some of the cases included were obviously available at the time it filed its initial response because they were published many years ago. It appears that Plaintiff simply missed them after conducting its initial research, kept performing research after the fact, and filed a notice of supplemental authority each time a persuasive case came along. While we could avoid any discussion of these cases altogether, we will nevertheless address them in the interests of fairness and completeness to make certain we are reaching the correct result.

plaintiffs prevailed and the district court entered judgment.  Shortly thereafter, the plaintiffs settled their claims and their former counsel sought to recover his fees. Before reaching the merits of the fee petition, the Second Circuit considered whether the case fell within the commercial activity exception of the FSIA.  The Court focused on the third clause of the commercial activity exception and found that each prong was satisfied because (1) the act of settling the underlying claim occurred outside the United States (i.e. Argentina), (2) there was no dispute that the settlement was made in connection with a commercial activity (i.e. bonds), and (3) the settlement ended a long-running lawsuit, thereby having a direct effect on the United States.

Plaintiff equates *Fontana* to the facts presented because it shows that the Court has jurisdiction under the FSIA.  Plaintiff first states that *Fontana* is persuasive because it supports the argument that Angola waived its sovereign immunity.  This argument is somewhat perplexing because Plaintiff no longer contends that Angola is subject to the Court's jurisdiction under the FSIA's waiver exception to sovereign immunity.  Plaintiff abandoned that argument when Plaintiff filed an amended complaint.[5]  It is therefore unclear why this argument was presented in conjunction with the notice of supplementary authority.  Either way, it is easily dismissed.

---

[5]     When Plaintiff filed its motion for leave to amend, it admitted that it wanted to "narrow its jurisdictional allegations by removing the allegations of express and implied waiver of immunity, thus focusing on the commercial activity exception to immunity pursuant to 28 U.S.C. § 1605(a)(2)."  [D.E. 47 at 3].

Plaintiff's next argument is that the alleged settlement in this case is the same as the agreement in *Fontana*. The problem with this contention is that, in *Fontana*, it was undisputed that the settlement agreement was commercial. *See Fontana*, 962 F.3d at 673 ("Argentina does not dispute that this settlement was made 'in connection with' its commercial activities.") (citing *Weltover*, 504 U.S. at 615–17 (holding that Argentina's issuance of bonds constitutes a commercial activity within the meaning of the FSIA); *Lord Day & Lord v. Socialist Republic of Vietnam*, 134 F. Supp. 2d 549, 559 (S.D.N.Y. 2001) ("[I]nitiation and settlement of commercial litigation may be a 'commercial activity' within the meaning of the statute.")). But, putting that aside, the underlying harm was, of course, commercial because the acts that actually injured the plaintiffs in *Fontana* were Argentina's failure to compensate bondholders. And as stated earlier, private actors can engage in the issuance of debt instruments so that holding makes perfect sense.

With that being said, *Fontana* is unhelpful because – when compared to the allegations in this case – Plaintiff does not complain that Angola failed to pay bondholders or that Angola engaged in any other commercial activity. Instead, Plaintiff alleges that Angola expropriated real property, commercial buildings, and bank accounts. *Fontana* therefore undermines Plaintiff's position because it shows that it is not the contract itself that constitutes the gravamen of a lawsuit. Rather, it is the underlying harm (i.e. the failure to compensate bondholders) that actually matters. So, if we take the reasoning in *Fontana* and look to the underlying harm beneath the contract in this case then we arrive at the same conclusion we reached

earlier because Plaintiff alleges that Angola expropriated real property.  And that constitutes sovereign activity and therefore falls outside the scope of the FSIA.  *See Beg*, 353 F.3d at 1326 ("Confiscation of real property is a public act because private actors are not allowed to engage in 'takings' in the manner that governments are.") (citing cases).  So the Second Circuit is entirely in sync with the Eleventh Circuit in this important respect.  Plaintiff's reliance on *Fontana* thus proves unhelpful.

In a second notice of supplemental authority filed on August 6, 2020 [D.E. 86], Plaintiff relies on a district court's decision in *Figueroa v. Ministry for Foreign Affairs of Sweden*, 222 F. Supp. 3d 304 (S.D.N.Y. 2016).[6]  There, an employee of Puerto Rican descent filed a state court action (that was later removed to federal court) against his employers,[7] asserting claims for personal injury, retaliation, and discrimination based on national origin, race, and disability, and a separate claim for the breach of a tolling agreement.  The defendants hired plaintiff as an office clerk and chauffeur.  The plaintiff's employment was governed by an employment agreement that provided, among other things, the plaintiff's entitlement to a pension, life insurance, and a funeral grant under Swedish law.

The plaintiff alleged that, from the beginning of his employment, his Swedish employers treated him differently and discriminated against him on a daily basis

---

[6]     Plaintiff also relied on the district court's opinion in *Reichler, Milton & Medel v. Republic of Liberia*, 484 F. Supp. 2d 1 (D.D.C. 2007), as support for the proposition that Angola's breach of a contractual duty had a direct effect on the United States.  We need not discuss this case because, for the reasons stated below, the actual harm that Plaintiff suffered was a sovereign act.

[7]     The plaintiff's employers in *Figueroa* were the Ministry of Foreign Affairs of Sweden and the Permanent Mission of Sweden to the United Nations.

due to his race and national origin.  In May 2012, the plaintiff's employer directed him to assemble two large pieces of furniture to avoid the cost of hiring professionals even though the assembly instructions stated that two workers with carpentry experience should perform the construction.  While assembling the furniture, the plaintiff alleged that he fell from a ladder, leading to serious injuries. Following his injuries and informing the defendants about the possibility of litigation, the parties entered into a tolling agreement that preserved all of the parties' claims and defenses.[8]

Although the district court found that Plaintiff's retaliation and discrimination claims were sovereign based and lacked jurisdiction under the FSIA, the court determined that a breach of the tolling agreement was commercial.  The plaintiff alleged that the defendants breached the tolling agreement when they reduced his medical leave compensation.  The defendants asserted, in response, that the tolling agreement should be considered a sovereign act and outside the court's jurisdiction because it was inextricably intertwined with the underlying employment claims for discrimination and retaliation, and therefore not the product of commercial activity.

---

[8]    The tolling agreement provided that, "[t]o enable [the defendants] to fully evaluate [the plaintiff's] claims, including those claims related to his physical injuries, and to enable the Parties to attempt to negotiate a confidential settlement of [the plaintiff's] claims, all of which are denied by [the defendants], [the plaintiff] will continue to remain on a partially paid leave of absence at the same level of compensation as presently being received (something to which [the defendants] take[ ] the position that he is not entitled to at this time)." *Figueroa*, 222 F. Supp. 3d at 309.

The district court rejected the defendants' argument because "plaintiff's claim [was] not that the defendants breached the underlying employment agreement by reducing his benefits, but that the defendants breached their obligations as set forth in a new contract wholly separate and apart from the underlying employment agreement." *Figueroa*, 222 F. Supp. 3d at 317.  The court reasoned that a tolling agreement created enforceable rights between the parties and that it was the type of contract that private parties regularly used to freeze their respective rights in anticipation of litigation.  *See id*. (citing *Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*, 81 F. Supp. 3d 1, 15 (D.D.C. 2015); *Medtronic Navigation, Inc. v. Saint Louis Univ.*, 2013 WL 5323307, at *4 (D. Colo. Sept. 23, 2013)).  That is, the tolling agreement provided that the plaintiff would keep his claims confidential and, in exchange, the defendants would maintain his leave and compensation.  And the court construed this agreement as "plainly not the product of an act peculiar to a sovereign." *Figueroa*, 222 F. Supp. 3d at 317.

The district court then relied on the Fifth Circuit decision in *United States v. Moats*, 961 F.2d 1198, 1205 (5th Cir. 1992), because it included a similar fact pattern where a sovereign breached a settlement agreement:

> In an analogous case involving a sovereign's alleged breach of a settlement agreement, the Court of Appeals for the Fifth Circuit reasoned that, "The negotiation of contracts, including entry into a settlement agreement, clearly is the type of act performed by private persons.  There, the Court of Appeals held that any jurisdictional inquiry under the commercial activity exception must focus on the settlement agreement that the sovereign allegedly breached.  Accordingly, the underlying activities and claims resolved by the settlement agreement were irrelevant to the jurisdictional inquiry. As the Court of Appeals concluded, the settlement "agreement functioned

24

> as a new contract between the parties, and [the plaintiff] now wants to recover for an alleged breach of that new contract," meaning that the settlement agreement was the activity that had to support jurisdiction under the commercial activity exception.  In that case, although the entry into the settlement agreement was a commercial activity, the commercial activity exception did not apply because the settlement agreement had no jurisdictional connection to the United States.

*Figueroa*, 222 F. Supp. 3d at 317 (internal citations omitted).   Finding this reasoning persuasive, the district court held that it was "irrelevant that the plaintiff's underlying employment relationship with the defendants was noncommercial in nature because the tolling agreement was a distinct transaction that is commercial in nature."  *Id*.

Plaintiff suggests that the reasoning in *Figueroa* is applicable here because it shows that any jurisdictional inquiry under the commercial activity exception must focus on the breach of a settlement agreement.  But, there is a noticeable problem when comparing *Figueroa* to the facts of this case.  *Figueroa*, unlike here, included disputes over *two contracts* – an employment agreement and a subsequent tolling agreement.   While the district court found that the underlying employment agreement was based on sovereign activity, the court made a distinction with respect to the tolling agreement because that was an entirely new contract apart from the plaintiff's claims for discrimination and retaliation.  The tolling agreement was also a contract that any private party could enter into because it froze the parties' rights in the contemplation of future litigation.  The district court therefore

refused to allow the defendants to enter into more than one contract and rely on the argument that they were all based on sovereign activity.[9]

This case is materially different because we do not have the presence of two contracts. We merely have allegations that Angola expropriated real property and that the parties entered into a contract to compensate Plaintiff for a wrongful taking. If this case involved facts where the parties entered into more than one commercial contract then *Figueroa* might have much more relevance. But, considering there is only one isolated contract at issue in this case, which is not in fact the source of the core injury that led us here, it is unclear as to how *Figueroa* is relevant to the facts presented.

To the extent *Figueroa* is at all relevant, it undermines Plaintiff's argument because – when the court considered whether plaintiff's employment was commercial or sovereign based with respect to the employment contract – it looked to the underlying facts of the employment relationship (as we did above) as opposed to the mere presence of a contract. Indeed, the district court focused on whether the plaintiff's job activities were governmental in nature and whether the employment relationship was "sufficiently intertwined with that activity to provide that the employment relationship itself was part of the governmental function. *Figueroa*,

---

[9]     Although not stated directly, the policy rationale for the district court's decision is that a foreign state should not be allowed to shield itself from the FSIA by breaching multiple contracts with the same underlying sovereign act. In other words, when a foreign state enters into a contract and then breaches it, it cannot enter into a subsequent contract and expect both contracts to be considered sovereign activity. If that were the rule, it would allow a foreign state to enter into countless contracts and avoid the FSIA merely because a sovereign act caused the first injury.

222 F. Supp. 3d at 313 (citation and quotation marks omitted).  The court did not hang its hat on the mere presence of a contract.  The court only examined the second contract (i.e. the tolling agreement) differently because that was "based upon" the breach of an underlying contract and therefore the actual harm was too attenuated to focus again on the plaintiff's employment relationship.

The district court's reliance on the Fifth Circuit's decision in *United States v. Moats* is distinguishable for many of the same reasons because that case also involved the presence of multiple contracts.  *See* 961 F.2d at 1205.  In that case, there were underlying contracts for the fabrication of steel and other materials, and then there was also a settlement agreement to resolve a breach of those contracts. The Fifth Circuit reasoned that the settlement agreement constituted commercial activity because it "functioned as a new contract between the parties," contemplated a resolution for the failure to pay for goods illegally removed from a factory (also a commercial activity unlike the allegations here), and the plaintiff "want[ed] to recover for an alleged breach of that new contract."  *Id.* at 1206.  Again, Plaintiff is not attempting to enforce a settlement agreement to resolve the breach of a prior contract.  Plaintiff only wants Angola to fulfill its obligations with respect to a single contract and to compensate Plaintiff for a wrongful taking.

*Moats* is distinguishable for an additional reason because, although the Fifth Circuit stated that "[t]he negotiation of contracts, including entry into a settlement agreement, clearly is the type of act performed by private persons," the Court found that there was "no doubt that the foreign employer engaged in commercial activity,

as opposed to the public acts of a sovereign, *at all relevant times*." *Id.* at 1205 (emphasis added).  This case is the opposite of *Moats* because every allegation in Plaintiff's pleading complains of a sovereign act.  Indeed, there is nothing about this case that resembles commercial activity other than the fact that the parties entered into a settlement agreement but, for the reasons explained below, that too is unpersuasive.

The Fifth Circuit also found that there was "nothing in the contracts or the agreement that would indicate the acts of a state, nor [did the foreign employer] suggest[] that these activities were really governmental activities." *Id.* (citing *Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic*, 877 F.2d 574, 578-79 (7th Cir. 1989) (describing contractual arrangements that may be considered public, rather than private, acts)).  That is significant because the foreign employer conceded that the acts were commercial based and that nothing required the use of sovereign power.  We agree with the Fifth Circuit's decision because the breach merely concerned the failure of one Mexican company to pay another.  Yet, this case alleges that Angola expropriated real property and that the settlement agreement was intended to compensate Plaintiff for an illegal taking.  And we have located not a single case – nor has Plaintiff referenced one – where private actors can enter into these types of agreements.  *See Moats*, 961 F.2d at 1205 ("An activity is considered 'commercial' if it is the type a private person normally would engage in for profit.") (citing *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1108 n. 6 (5th Cir. 1985)).  The reason for that omission is because a taking is a sovereign power – meaning

private actors cannot resolve these types of disputes among themselves because they cannot expropriate real property in the first place.

### 4. *Whether Entry of a Settlement Agreement is a Commercial Act*

Having now considered every case that Plaintiff relies on, this leads us to the only argument left standing:  whether the entry into a settlement agreement by itself (notwithstanding that it involves the taking of real property) is enough to constitute a commercial act.  This argument fails because if the only thing that mattered were the settlement agreement itself, then any conduct flowing from a breach could constitute commercial activity.  In other words, entering into a settlement agreement cannot be *per se* commercial activity because it would vastly expand jurisdiction under the FSIA while, at the same time, turning a blind eye to the conduct that actually harmed a plaintiff.  It would, for example, allow a plaintiff to sue a foreign state for an unlimited range of sovereign conduct merely because the parties attempted to resolve a dispute in a settlement agreement.  Because jurisdiction under the FSIA is limited to the exceptions provided in the statute and to the conduct that actually caused an injury, Plaintiff's proposed rule would, in many respects, rewrite the FSIA and allow for U.S. courts to consider matters far beyond the scope that Congress provided.

The opposite danger was presented in *Figueroa* and *Moats* because the foreign state in those cases wanted to bypass the FSIA with arguments that, irrespective of multiple breaches, the same underlying sovereign conduct should be enough to shield themselves from liability.  This too was an attempt to rewrite the

FSIA because it would have allowed a foreign state to enter into a contract, breach it, and then enter into subsequent contracts and breach them by relying again on the same sovereign conduct that led to the first breach.  If the courts had adopted that rule, it would have allowed any foreign state to enter into more than one contract and avoid the FSIA merely because a sovereign act caused the first injury.

Neither position holds water because both fail to examine whether an act is actually "based upon" commercial activity.  In *Figueroa* and *Moats*, the actual injury was the breach of the settlement agreement that attempted to resolve the underlying breach of contracts.  And in this case, the actual injury is the taking of real property.  The difference is subtle, but important because if ones goes too far in favor of a foreign state then any sovereign conduct can be used to defeat jurisdiction for a breach contract claim, irrespective of how many breaches the sovereign commits.  On the other hand, if one goes too far in Plaintiff's corner then any breach of contract constitutes commercial activity.  Neither is correct because – while the former would severely restrict jurisdiction under the FSIA – the latter would vastly expand it.

Returning to Plaintiff's argument that the mere presence of a settlement agreement is enough to constitute commercial activity, this is unconvincing for an entirely separate reason because this is not the first time that it has been considered.  The plaintiff in *Beg* made a similar contention with an attempt to focus solely on the presence of contract with the hope that it would constitute commercial activity.  Beg complained that the Government of Pakistan, the Pakistan Army and

the regional Government of Punjab expropriated his real property and offered him other parcels of land in exchange for a taking.  But, Beg later learned that he did not have good title to these parcels of land and that the Pakistani courts refused to recognize him as the owner.  Beg then entered into a subsequent agreement with the Government of Punjab where the latter *agreed* to provide him with monetary compensation.  Beg argued, like Plaintiff, that this agreement – subsequent to his original injury – was equivalent to a contract and constituted commercial activity. But, the Eleventh Circuit rejected that position because, irrespective of whether the agreement to compensate Beg was the equivalent of a contract, private actors cannot enter into contracts to resolve the taking of real property:

> Beg contends that the Punjabi regional government's agreement to compensate him is the equivalent of a contract and, therefore, is commercial activity.  This analogy is not persuasive.  First, as the Supreme Court made clear in *Weltover,* the dispositive issue in determining whether an activity is commercial is whether private actors could undertake this type of activity in a market.  Expropriation is neither the type of activity in which private actors engage nor is it a market transaction.  Second, the FSIA has a separate exception for certain foreign government expropriations, further indicating that a foreign government's use of its eminent domain power is not commercial activity.

*Beg*, 353 F.3d at 137-28 (citations omitted).

Plaintiff attempts to sidestep *Beg* with arguments that the signing of a settlement agreement should be the end of the inquiry, yet Plaintiff fails to explain how this case can be considered commercial activity when, like *Beg*, it seeks to litigate a failure to compensate for the taking of real property.  Beg tried to enforce a subsequent agreement for his original injury, but he failed because – irrespective

of whether the agreement with the Government of Punjab was an enforceable contract – private actors cannot enter into contracts to resolve takings. Plaintiff is now struggling to do the same with this supposed "oral settlement agreement" of a pending case. Yet, it is very hard to see how a different conclusion can be reached if private actors cannot engage in these types of contracts in the first place. Plaintiff suggests that a settlement agreement is somehow different than a traditional contract but offers no explanation other than the cases that the Court has already distinguished.

The Eleventh Circuit's holding in *Beg* makes sense when considering the case law referenced above. It is not the presence of a "contract" that is dispositive. In *Nelson*, for example, the plaintiff signed a contract to work in the United States and, for the reasons already stated, the Supreme Court concluded that there was no commercial activity because the plaintiff's claims were not based on the contract itself. *See Nelson*, 507 U.S. at 352. Instead, Nelson's claims were based on Saudi Arabia's tortious conduct because the actions that actually harmed him were due to the sovereign state's police and penal officers – actions that were peculiarly sovereign in nature.

Now, juxtapose *Nelson* with the Eleventh Circuit's decision in *Devengoechea*, where a plaintiff and Venezuela also entered into a contract for the purchase of a private collection of artifacts. *See Devengoechea*, 889 F.3d at 1221. Unlike Saudi Arabia's actions in *Nelson*, "Venezuela flew to the United States to meet with the seller, examined the Collection, and negotiated to examine it further and return or

purchase it." *Id.*   The Eleventh Circuit found that this constituted commercial activity because "[t]his [was] the type of activity that private persons and corporations regularly engage in" and "[n]othing about this activity is uniquely or peculiarly sovereign in nature." *Id.*

The reason that the outcomes in these cases are different – notwithstanding the fact that both included contracts – is because the analysis does not turn solely on a contract or a settlement agreement.   There was a contract in *Nelson*, but the plaintiff failed to show that the injuries suffered were commercial because Saudi Arabia used its police powers to torture and beat him.   There was also a contract in *Devengoechea*, yet the plaintiff was able to show commercial activity because every action that Venezuela took resembled a private actor.   *Devengoechea*, 889 F.3d at 1230 ("[N]othing in the record support[ed] the notion that Venezuela came into possession of or refused to pay for or return the Bolívar Collection through the exercise of its sovereign 'takings' power.").   Plaintiff suggests, without any other authority, that a settlement agreement alone is what matters and that the analysis should stop there.[10]   Yet, this is mistaken because every Eleventh Circuit and

---

[10]   Even if we found Plaintiff's position to be persuasive and focused solely on the contract itself, the conclusion remains the same because the contract in this case was an attempt to compensate a property owner for a taking – a contract that the Eleventh Circuit considers to be a sovereign function.   *See Beg*, 353 F.3d at 1327 ("Determining whether or how to compensate property owners for takings is also a sovereign function, not a market transaction.") (citing *Carmack*, 329 U.S. at 236-37).

Supreme Court case on this issue has shown that this is legally incorrect.[11]  What matters is not necessarily a settlement agreement but whether private actors can undertake the same type of alleged activity.  And given the allegations in this case, no private actor can expropriate real property, commercial buildings, and bank accounts.  That is a sovereign power.

In sum, the Court does not have jurisdiction under the FSIA because, although the signing of the settlement agreement took place outside the United States (i.e. Portugal), the core of this lawsuit relates to the taking of real property and that constitutes sovereign – not commercial – activity.

The parties presented additional arguments on whether Angola's failure to wire $47.5 million dollars to a Florida bank account had a direct effect on the United States, but we need not reach that question because jurisdiction is already lacking under the second prong.  That is, even if Angola's failure to wire money to Florida had a direct effect on the United States, it would not cure the failure to meet the second prong of the commercial activity exception and our analysis need not go any further.[12]  Plaintiff's failure to meet the second prong also means that we lack personal jurisdiction because "[i]f a foreign state is immune under the FSIA, courts of the United States lack both subject matter and personal jurisdiction in any

---

[11]     Even if the out-of-circuit cases that Plaintiff relies are read to hold otherwise, they would then be squarely inconsistent with the Eleventh Circuit's decisions. *Beg* and its progeny are binding authority in our case and must control.

[12]     Plaintiff did not argue that jurisdiction existed under the expropriation exception of the FSIA.  That exception, codified at § 1605(a)(3), provides that immunity does not apply in any case "in which rights in property taken in violation of international law are in issue."  Because Plaintiff never raised this exception nor provided any arguments in support thereof, we will not consider it.

suit against it." *Samco Glob. Arms, Inc. v. Arita*, 395 F.3d 1212, 1214 (11th Cir. 2005) (citing *Weltover, Inc.,* 504 U.S. at 611).  Because Plaintiff failed to allege that Defendant engaged in any commercial activity, this case does not fall under the § 1605(a)(2) exception to foreign government immunity and therefore the Court lacks subject matter jurisdiction under the FSIA.  Accordingly, Defendant's motion to dismiss should be **GRANTED** for lack of subject matter jurisdiction.

## III. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss should be **GRANTED** for lack of subject matter jurisdiction.  The case should thus be Closed.[13]

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, with the District Judge.  Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to

---

[13]   Putting aside the fact that Plaintiff has now had two opportunities to draft its complaint, we recommend a dismissal without further leave to amend because no amendment could cure the commercial activity exception without a complete re-write of the allegations in this case. *See Hourani v. Mirtchev,* 943 F. Supp. 2d 159, 171 (D.D.C. 2013) (stating that "[a] plaintiff . . . may not plead facts in their amended complaint that contradict those in their original complaint.").  "While reconcilable 'small variations' between the complaints are acceptable, *Price v. Socialist People's Libyan Arab Jamahiriya,* 389 F.3d 192 (D.C. Cir. 2004), a plaintiff may not blatantly change the facts to respond to a defendant's motion to dismiss and while doing so contradict the facts set forth in the prior pleading.  *See Colliton v. Cravath, Swaine & Moore LLP,* 2008 WL 4386764, at *6, (S.D.N.Y. Sept. 24, 2008) (internal quotation marks and citations omitted).

factual or legal conclusions included in the Report.  28 U.S.C. § 636(b)(1); 11th Cir.

Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley*

*v. Commissioner of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

     **DONE AND SUBMITTED** in Chambers at Miami, Florida, this 13th day of

August, 2020.

                                 /s/ *Edwin G. Torres*          
                                 EDWIN G. TORRES
                                 United States Magistrate Judge